UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BDI, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 16-CV-0226-CVE-FHM |
| | ) |
| SUMMIT DRILLING COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Now before the Court is defendant Summit Drilling Company, Inc.'s (Summit) motion for summary judgment (Dkt. # 55). Summit moves for summary judgment, arguing that plaintiff BDI, LLC's (BDI) breach of contract and negligence claims are barred by the parties' contract and that BDI has failed to provide sufficient evidence to support its fraud claim. Dkt. # 55, at 8-13. BDI responds that it assumed only reasonably foreseeable risks in the contract, that the contract does not restrain consequential damages in this case, and that questions of fact remain as to Summit's alleged fraudulent misrepresentation. Dkt. # 76, at 10-15.

I.

On October 16, 2014, the parties entered into a drilling contract, under which Summit would drill an oil well in Richardson County, Nebraska. Dkt. # 55-1, at 1. The contract is a standard form created by the International Association of Drilling Contractors (IADC) (Drilling Bid Proposal and Footage Drilling Contract - U.S. # 14-2114, revised 2003). See Dkt. # 55-1, at 1. First, the contract provides that:

> When operating on a Daywork Basis,[1] [Summit] . . . assumes only the obligations and liabilities stated herein as being applicable during Daywork operations. Except for such obligations and liabilities specifically assumed by [Summit], [BDI] shall be solely responsible and assumes liability for all consequences of operations by both parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations.

Dkt. # 55-1, at 1 (emphasis omitted). The contract also specifies that "[i]n the event the hole should be lost or damaged, while [Summit] is working on a Daywork Basis, [BDI] shall be solely responsible for such damage to or loss of the hole . . . ." Id. at 4. Additionally, the contract states that:

> it is the intent of the parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract . . . be without limit and without regard to the cause or causes thereof, including but not limited to . . . any theory of tort, breach of contract, fault, the negligence of any degree or character, . . . or any other theory of legal liability.

Id. at 5.

Summit drilled the well to the depth set out in the contract, but BDI determined that it was likely unproductive and asked defendant to plug the well. Dkt. # 55, at 5; Dkt. # 76, at 5. Approximately a year later, BDI hired a different drilling company to re-open the well by performing a washdown, a procedure for opening a plugged well by drilling through the cement plugs. Dkt. # 55, at 2 & n.1. After drilling through the upper cement plug, the drilling company hit an object that prevented further drilling. Dkt. # 55-2, at 33. After hitting the object, BDI president Mark Crawford sent a text message to Summit employee Scott Miller informing him of BDI's

---

[1] The conduct at issue in this case all occurred after the well was drilled, and the parties agree that any work performed by defendant after the well was drilled, including plugging the well, was done on a daywork basis. Dkt. # 55, at 6; Dkt. # 76, at 6-7; Dkt. # 55-1, at 2.

2

attempted washdown of the well and asking if Miller knew anything about a metal object left in the well. Id. Miller responded:

> I understand. I will ask. Shouldn't be anything down that hole other than cement!
>
> I've talked to the guys that are still with us and no one knows of anything dropped down hole. Unfortunately that doesn't mean much at this point. If you do identify the metal, I'd like to know. Especially if it points to us. That's not the reputation I want to have.

Id. at 33-34. BDI alleges that the object was a joint of a metal drill pipe left by Summit when it was plugging the well. Dkt. # 76, at 9. Plaintiff asserts that the object blocking the well destroyed the well's ability to effectively produce oil. Id. at 10.

## II.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (quoting Fed. R. Civ. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." Id. at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

### A.

Summit argues that the parties' contract precludes BDI's breach of contract and negligence claims. The contract provides that it will be "construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws of [the] State of Kansas." Dkt. # 55-1, at 6. The parties agree that Kansas law should be applied to BDI's breach of contract and negligence claims in this case. Dkt. # 55, at 5, 7; Dkt. # 76, at 5, 10.

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." Waste Connections of Kan., Inc. v. Ritchie Corp., 298 P.3d 250, 264 (Kan. 2013) (quoting Osterhaus v. Toth, 249 P.3d 888 (Kan. 2011)) (internal quotation marks omitted). If the language of a contract is ambiguous, the court may consider extrinsic evidence to construe the contract's meaning. Id. "To be ambiguous, a contract must contain

4

provisions or language of doubtful or conflicting meaning, as gleaned from the natural and reasonable interpretation of its language." Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 810 P.2d 283, 286 (Kan. 1991). The meaning of a contractual provision should not be construed in isolation, but in light of "the entire instrument from its four corners." Levin v. Maw Oil & Gas, LLC, 234 P.3d 805, 814 (Kan. 2010) (quoting Johnson Cnty. Bank v. Ross, 13 P.3d 351 (Kan. Ct. App. 2000)).

Here, BDI alleges that Summit breached the contract and acted negligently by leaving materials in the well while plugging it. Dkt. # 2-2, at 5. The contract calls for Summit to "either complete the well and install well head equipment and connections or plug and abandon same, in accordance with [BDI's] instructions." Dkt. # 55-1, at 3. The parties agree that, on BDI's request, Summit plugged the well. Dkt. # 55, at 5; Dkt. # 76, at 6. BDI's allegation is not that Summit failed to plug the well, but that it did so in a manner that rendered the well unusable by leaving a drill pipe down the hole. The contract does not contain a provision in which Summit agreed to perform its work under the contract pursuant to a certain standard. However, under Kansas law, "there is implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner." Coker v. Siler, 304 P.3d 689, 695 (Kan. Ct. App. 2013); see also In re Talbott's Estate, 337 P.2d 986, 991 (Kan. 1959). It appears that BDI is arguing that Summit breached this duty by leaving a drill pipe in the well. The problem with BDI's breach of contract and negligence claims is that in the contract BDI explicitly and unambiguously assumed broad liability for the conduct alleged in these claims.

First, BDI unambiguously assumed all liability for the actions of both parties while Summit worked on a daywork basis unless stated otherwise in the contract, Dkt. # 55-1, at 1, and BDI has

5

not pointed to any provision in the contract, nor could the Court find any in its own examination, that could conceivably place liability on Summit for its work plugging the well. Second, BDI assumed sole responsibility for any damage to or loss of the hole while Summit worked on a daywork basis, including "the cost of removal of any debris." Id. at 4. And third, the parties made clear that they intended any release or assumption of liability to be "without limit and without regard to the cause or causes thereof," including "any theory of tort, breach of contract, fault, [or] negligence of any degree or character." Id. at 5.

The Court agrees with Summit that, under the plain meaning of the contract, BDI unambiguously assumed all liability, and released Summit of all liability, for damage to or loss of the hole while Summit was plugging the well, including any damage caused by Summit leaving a drill pipe in the hole. Although exculpatory contract provisions are disfavored and should be strictly construed, Talley v. Skelly Oil Co., 433 P.2d 425, 431 (Kan. 1967), when a "contract is unambiguous, a court may not rewrite the contract for the parties; '[i]t's function is to enforce the contract as made.'" BancInsure, Inc. v. FDIC, 796 F.3d 1226, 1233 (10th Cir. 2015) (quoting Catholic Diocese of Dodge City v. Raymer, 840 P.2d 456, 459 (Kan. 1992)) (alteration in original); see also B & K Mech., Inc. v. Fed. Ins. Co., 33 F. Supp. 2d 941, 944 (D. Kan. 1998) ("[T]he court should not strain to create an ambiguity where, in common sense, none exists.") (citing Miner v. Farm Bureau Mut. Ins. Co., 841 P.2d 1093, 1105 (Kan. Ct. App. 1992)). The contract unambiguously releases Summit from any liability arising while Summit worked on a daywork basis unless explicitly contradicted by another provision in the contract. There is no contract provision placing liability on Summit for how it plugged the well. Even without BDI's general assumption of liability, BDI's claim that Summit damaged the well and rendered it unusable by leaving a drill pipe

6

in it while plugging the hole falls squarely under BDI's specific assumption of liability for damage to or loss of the hole. Moreover, under the contract, it does not matter how the damage to the well occurred or who was at fault; BDI clearly assumed broad liability for <u>all</u> damage to and loss of the well while Summit worked on a daywork basis, including any damage or loss caused by leaving a drill pipe in the well while plugging it. Thus, under the plain terms of the contract, BDI has no valid claim for breach of contract or negligence even if Summit left a drill pipe in the well.[2]

However, there are limits to the enforceability of exculpatory agreements, and the Court must determine whether the exculpatory provisions of the contract that bar BDI's breach of contract and negligence claims are enforceable under Kansas law. See <u>Sundance Energy Okla. LLC v. Dan D. Drilling Corp.</u>, 836 F.3d 1271, 1276-77 (10th Cir. 2016) (looking to Oklahoma law to determine whether defendant could use a drilling contract's exculpatory clause to defend against a gross negligence claim); <u>ANR Prod. Co. v. Westburne Drilling, Inc.</u>, 581 F. Supp. 542, 547 (D. Colo. 1984) (looking to Colorado law to determine enforceability of a drilling contract's exculpatory clause releasing defendant from liability for its own negligence). "It is the traditional rule, followed

---

[2]    BDI argues that Summit cannot rely the assumption of risk defense. Dkt. # 76, at 10-13. The assumption of risk doctrine can bar recovery for an employee's claim against her employer for failure to provide a reasonably safe workplace when the employee knew of the dangerous situation and voluntarily exposed herself to that danger. See <u>Simmons v. Porter</u>, 312 P.3d 345, 348 (Kan. 2013). BDI's argument regarding assumption of risk is irrelevant because Summit does not assert an assumption of risk defense, see Dkt. # 85, at 6, and, even if BDI had made such an assertion, the Kansas Supreme Court abandoned the doctrine in 2013. <u>Simmons</u>, 312 P.2d at 355 ("We . . . are now clearly convinced preserving assumption of risk as a complete bar to recovery is no longer sound and should be of no practical effect given the statutory scheme of comparative fault."). Summit's argument is that BDI specifically and explicitly assumed the risk of damage to the well in the contract, and therefore BDI cannot bring its breach of contract or negligence claims against Summit for damage to the well, which is different from the narrow assumption of risk doctrine recently abandoned in Kansas.

in Kansas, that mentally competent parties may make contracts on their own terms and fashion their own remedies where they are not illegal, contrary to public policy, or obtained by fraud, mistake, overreaching, or duress." Corral v Rollins Protective Serv. Co., 732 P.2d 1260, 1263 (Kan. 1987). In general, "Kansas law is fairly liberal in allowing business parties standing on equal footing freedom to negotiate contractual provisions, including certain risk allocation provisions." Butler Mfg. Co. v. Americold Corp., 835 F. Supp. 1274, 1278-79 (D. Kan. 1993). Exculpatory clauses for negligent conduct that are voluntarily executed between parties standing on an equal footing are generally valid and enforceable between the parties themselves. . Talley, 433 P.2d at 430; see also Mid-Am. Sprayers, Inc. V. U.S. Fire Ins. Co., 660 P.2d 1380, 1385 (Kan. Ct. App. 1983) (reviewing Kansas law on the enforceability of exculpatory clauses).

Here, the parties are both businesses that regularly deal with drilling and drilling contracts, and the contract signed is a standard form written by the IADC. See Dkt. # 85-1, at 2 ("Q: And have you read the agreement you entered into with Summit from beginning to end? A: I have not studied it. You know, I read it. It's a pretty standard contract. I've seen a bunch of them before.") (deposition testimony of BDI president Mark Crawford). BDI's negligence and breach of contract claims do not involve any bad faith or gross negligence. This is not the sort of situation where Kansas law would permit the Court to step in and refuse to enforce an exculpatory provision. There is no evidence that Summit did anything illegal, or that the agreement was "obtained by fraud, mistake, overreaching, or duress." Additionally, the Court sees no reason why enforcing the exculpatory provision in this case would be detrimental to the interests of the public. See Belger Cartage Serv., Inc. v. Holland Constr. Co., 582 P.2d 1111, 1119 (Kan. 1978) ("A contract is not void as against public policy unless injurious to the interests of the public or [it] contravenes some

8

established interest of society."). This is an industry standard drilling contract between two businesses that have experience in, and are familiar with, the drilling industry. In these circumstances, the exculpatory provisions of the contract are enforceable under Kansas law as to BDI's breach of contract and negligence claims. Thus, Summit's motion for summary judgment should be granted as to BDI's breach of contract and negligence claims.

**B.**

Summit argues that BDI has failed to provide sufficient evidence to support its fraud claim. It is unclear what state's law applies to BDI's fraud claim. The parties each argue under both Oklahoma and Kansas law, and the information required to make the choice of law determination has not been presented to the Court. Fortunately, the elements of fraud are the same under Oklahoma and Kansas law, and the Court will proceed, as the parties did in their briefs, under both Oklahoma and Kansas law.

The elements of a fraud claim are: (1) defendant made a material representation that was false; (2) defendant knew the representation was false or made the statement with reckless indifference to its veracity; (3) defendant made the representation with the intent to induce plaintiff into act upon it; and (4) plaintiff relied upon the representation. See Bowman v. Presley, 212 P.3d 1210, 1217-18 (Okla. 2009); Kelly v. VinZant, 197 P.3d 803, 808 (Kan. 2008). BDI alleges that Summit made false representations in two ways. First, BDI alleges that Summit's failure to tell BDI that it left a drill pipe in the well was a false representation. Dkt. # 76, at 15. Second, BDI alleges that the text message conversation between Crawford and Miller, during which Miller said that there should not be an object down the well and that no one he had talked to at Summit knew about a potential object left in the well, was a false representation. Id.

9

BDI has presented no evidence that, even if Summit had left a drill pipe in the well, Summit made <u>knowingly</u> false misrepresentations about it to BDI and <u>intended</u> BDI to act upon that misinformation. In its response brief, BDI simply states that "[a] question of fact remains as to whether the statement was known to be false at the time it was made, and whether Summit intended that BDI rely on that misrepresentation." Dkt. # 76, at 15. BDI cites no evidence to support its assertions, and the Court has found none in the record. In the case of the alleged fraud by omission, it is even unclear what action BDI is alleging Summit to have intentionally tried to induce. As for the alleged fraud in the text messages between Crawford and Miller, there is no evidence in the messages themselves to support BDI's allegation that Miller was attempting to get BDI to continue trying to unplug the well. Throughout the messages Miller conveys surprise, states that Summit does not know what the object in the well could be, attempts to find out whether the evidence points to a Summit mistake, and offers to help Crawford and BDI. See Dkt. # 55-2, at 33-37. Miller makes no statement that could conceivably be construed as deliberately encouraging BDI to continue trying to unplug the well. In his deposition, Crawford was unsure whether the text messages even constituted a misrepresentation. <u>Id.</u> at 18 ("Q: If Summit provided misinformation to BDI, I'd like to know what that misinformation is. A: I don't really have an answer for that. Q: You're unaware of any? . . . A: Yeah, I don't think there's any – I'm not aware of any misinformation. It's just we didn't get any help from them at all."). But even if the Court assumes Summit made a false misrepresentation, there is no evidence in the messages of Summit attempting to induce BDI into action, and BDI has presented no other evidence of inducement. Because BDI has presented no evidence to show that Summit made a false representation with the intent to induce BDI to act upon

it, there is no genuine issue of fact as to inducement, and Summit's motion for summary judgment will be granted.

**IT IS THEREFORE ORDERED** that Summit Drilling Company, Inc.'s motion for summary judgment (Dkt. # 55) is **granted**. A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that BDI, LLC's motions in limine (Dkt. ## 52, 53, 54) and motion for partial summary judgment (Dkt. # 56) are **moot**.

**DATED** this 14th day of April, 2017.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE